# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA

ROBERT LEWIS, JR., on behalf of himself
and others similarly situated,

      Plaintiff,

    vs.

KEY DIGITAL STRATEGIES LLC

      Defendant.

Case No. 1:25-cv-02757

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Key Digital Strategies, LLC ("KDS") admits it sent six unsolicited marketing text message calls to Plaintiff's residential cellular telephone number, which has been on the National Do Not Call Registry since long before KDS began its campaign. That is undisputed. The sole basis that KDS contends it is entitled to summary judgment is because, as a legal matter, it claims a text message call isn't a "call" within the meaning of the TCPA.

Plaintiff candidly acknowledges that at least three cases in this District have answered that question in KDS's favor. However, Plaintiff respectfully submits, as Judge Catherine Henry of the Eastern District of Pennsylvania concluded after independently performing the same post-*McLaughlin* analysis on one of those cases in *Cole v. C/T Install America, LLC*, 2026 WL 916582 (E.D. Pa. Mar. 23, 2026), that those decisions were wrongly decided. This Court is not bound by

1

them, and four interpretive errors run through each. Each of this Court's prior decisions rest on the wrong interpretive time frame, are blind to pre-1991 usage referring to text-based communications as "calls," misread the 2018 § 227(e) amendments, and misapply the surplusage canon. This Court should instead follow the growing wealth of authority in which courts across the country, relying on their own independent reading of the statute, have decisively held that text message calls are "calls" within the meaning of the TCPA.

Beyond those errors, the only circuit court to address this question post-*Loper Bright* and post-*McLaughlin*, the Ninth Circuit in *Howard v. Republican Nat'l Comm.*, 164 F.4th 1119, 1123-24 (9th Cir. 2026), reaffirmed, without any agency deference, that text messages are "calls" under its own independent statutory construction. KDS's reliance on *Alexander v. Sandoval*, 532 U.S. 275 (2001), inverts the rule. *Sandoval* restrains courts from inferring implied private rights of action. It does not authorize courts to artificially narrow an express one that Congress already enacted. The Motion should be denied.

Finally, although KDS expressly disclaimed consent and injury as material, the Affidavit of John Graves sweeps in disputed and inadmissible material, including legal conclusions that have no place on this Motion. KDS's request for an order that "no class can be certified" is also procedurally improper, as KDS has not moved under Rule 23, and a MSJ is not the proper vehicle for this relief.

2

## BACKGROUND

Plaintiff is the subscriber and customary user of a residential cellular telephone number that has been listed on the National DNC Registry since well before the messages at issue. (Lewis Decl. ¶ 4-11.) He uses the number for personal, family, and household purposes. (*Id.* ¶ 10.) He has never been a Poll2Action user, never created an account, never submitted his number on any Poll2Action form, never checked any consent box, and never authorized any third party to do so. (*Id.* ¶ 12-13, 18-29.)

Beginning on or about April 15, 2025, KDS sent unsolicited marketing text message calls to Plaintiff's DNC registered number. (*Id.* ¶ 14.) The parties agree that KDS sent text messages; the only disagreement, for the purposes of *this* Motion for Summary Judgment, is whether or not those text message calls legally qualify as "calls" under the TCPA.

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). All evidence and reasonable inferences are construed in favor of the nonmovant. *Stewart v. Happy Herman's Cheshire Bridge, Inc.*, 117 F.3d 1278, 1285 (11th Cir. 1997). Affidavits in support of such a motion must rest on personal knowledge and admissible facts, not legal conclusions, rank

3

speculation, or argument. *Togun v. Sprint/United Mgmt. Co.*, No. 1:06-CV-2793-GET-ECS, 2008 WL 11320229, at *1 n.2 (N.D. Ga. July 3, 2008); Fed. R. Civ. P. 56(c)(4); *See also Leigh v. Warner Bros.*, 212 F.3d 1210, 1217 (11th Cir. 2000).

**ARGUMENT**

**I.  THE NORTHERN DISTRICT OF GEORGIA DECISIONS KDS RELIES ON WERE WRONGLY DECIDED AND ARE NOT BINDING ON THIS COURT.**

KDS's Motion rises and falls on two decisions from this District: *Kendo*, *1-800-Flowers*, and Judge May's later decision in *Irvin. v. Sonic Indust. Serv's., LLC*, which relied on the previous two. None binds this Court. With respect to this Court's colleagues on this bench, each rests on the same four interpretive errors, addressed in turn.

**A.  The Georgia decisions apply the wrong time frame for "plain meaning."**

The *Kendo*, *1-800-Flowers*, and *Irvin* courts purported to follow *Loper Bright*'s instruction that statutory meaning is "fixed at the time of enactment," *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024), but in fact do the opposite. They read "telephone call" through *modern* parlance, in which smartphone users colloquially distinguish a voice call from a text message. *Davis v. CVS Pharmacy, Inc.*, 797 F. Supp. 3d 1270, 1273 (N.D. Fla. 2025) ("No normal person refers to a text message . . . as a 'call.'"). That is the wrong inquiry. "[U]nless otherwise defined, words will be interpreted as taking their ordinary,

4

contemporary, common meaning . . . *at the time Congress enacted the statute*." *Perrin v. United States*, 444 U.S. 37, 42 (1979).

To look at what the contemporary, common meaning of the term "telephone call" was in 1991 when Congress enacted the statute, we look to the dictionaries of the era. *Royal Palm Vill. Residents, Inc. v. Slider*, 57 F.4th 960, 964 (11th Cir. 2023). And those dictionaries decisively reflect that people in 1991 did not use the word "call" to refer solely to voice-based communications. This basic definition of the word "call" appears in many dictionaries from around the time of the TCPA's passage. *See, e.g.*, *Random House Webster's College Dictionary* (1991) ("to communicate or try to communicate with by telephone"); *Oxford English Dictionary* (2d ed.1989) ("a summons or communication by telephone"). "The contemporary definition of 'telephone call' was therefore not limited to oral or vocal communications. It encompassed any communication made using a telephone." *Wilson v. Better Mortgage Corp.*, No. 25 Civ. 5503, 2025 WL 3493815, *5 (S.D.N.Y. Dec. 5, 2025).

In fact, other dictionaries of the era explicitly treat "telephone call" and "call" as synonymous. For instance, the Oxford Encyclopedic English Dictionary defines a "telephone call" as a "call," and defines "call" as "to communicate or converse with by telephone or radio." *See* "call," Oxford Encyclopedic English Dictionary 209 (2d ed. 1991). Under any of these definitions, a "telephone call" is

5

simply a communication made by telephone, which plainly includes text messages sent from one telephone to another. It indicates no preference for voice communication. To "telephone" someone is to "send (a message) by telephone." *Id.* 1484. These definitions reinforce the understanding that, even in 1991, a "telephone call" need only transmit a "message," not include a vocal component. Fax machines, pagers, teletypewriters, and TTY devices are all technologies available in 1991 that transmitted text-based "messages" using calls to telephones. None of these definitions requires voice. Each is satisfied by a communication transmitted between telephones.

And courts have long recognized that these definitions, which encompass any attempt to communicate with someone by telephone, are the meaning of "telephone call" that Congress would have intended in 1991, when the TCPA was enacted. *See, e.g.*, *Ashland Hosp. Corp. v. Serv. Emps. Int'l Union, Dist. 1199 W.V./Ky./Oh.*, 708 F.3d 737, 742 (6th Cir. 2013); *Better Mortgage Corp.*, 2025 WL 3493815, at *5; *Sagar v. Kelly Auto. Grp., Inc.*, No. 21 Civ. 10540, 2021 WL 5567408, at *4 (D. Mass. 2021); *Schaevitz v. Braman Hyundai, Inc.*, 437 F. Supp. 3d 1237, 1247 (S.D. Fla. 2019). Texting is, of course, a means of communicating with someone by telephone. So "text messaging plainly fits within that literal definition of a 'call,' because 'text messaging is a form of

6

communication used primarily between telephones.'" *Howard*, 164 F.4th at 1123-24 (quoting *Satterfield*).

*New Prime, Inc. v. Oliveira*, which the *Irvin* court invoked, proves the point for Plaintiff. *New Prime* held that a 1925 Act's reference to "contracts of employment" reached contracts for work involving independent contractors, even though "[t]o many lawyerly ears today, the term . . . "employment" might call to mind only agreements between employers and employees." 586 U.S. 105, 113 (2019). The Court explained that current colloquial usage can be misleading where language has evolved. *See id.* When modern intuition departs from original public meaning, original meaning controls. *See id.* The Georgia decisions, including those cited by KDS, invert that rule by elevating 2026 smartphone parlance over the 1991 dictionaries Congress would have consulted.

The Ninth Circuit, performing exactly the analysis *Loper Bright* requires, without any FCC deference, reached the opposite conclusion of the aforementioned courts on the same statutory term, reasoning "text messaging plainly fits within that literal definition of a 'call,' because text messaging is a form of communication used primarily between telephones." *Howard*, 164 F.4th at 1123-24 (quoting *Satterfield v. Simon & Schuster, Inc.*, 569 F.3d 946, 954 (9th Cir. 2009)) (cleaned up). Judge Henry disagreed with the *Radvansky* cases and reached

the same conclusion on her own independent post-*McLaughlin* reading in *Cole*. 2026 WL 916582, at *1 n.1.

### B. Examples of pre-1991 technologies confirm text-based telephone communications were already understood as "calls."

The aforementioned decisions also assumed, wrongly, that "telephone call" in 1991 could only have meant voice communication because text messaging, in its current form, did not exist in 1991. But closely analogous predecessor technologies *did* exist in 1991. Text-based telephone communication predates the TCPA by decades, and Congress expressly recognized that text communications could take the form of "call[s]" one year before passing the TCPA. The Americans with Disabilities Act of 1990 uses the word "call" throughout its text to refer to telephone calls placed using a telephone relay operator, in which an operator types the other side's speech into a TTY/TDD device for a deaf individual to read. Congress explicitly required telephone companies to deliver such text-based telephone calls for the deaf on equal footing with voice services. Throughout the ADA, Congress repeatedly referred to those text-based communications as "calls," including in the relay-records limitation, which restricts text record retention beyond "the duration of the *call*." 47 U.S.C. § 225(d)(5) (emphasis added).

That statutory backdrop is dispositive. Congress drafted the TCPA against a legal regime in which it had just told the FCC and the telephone industry that text-

based telephone communications were "calls." 47 U.S.C. § 225. The Court should presume that Congress understood the very word it used. To read "telephone call" in § 227(c)(5) as encompassing only voice calls would mean that, even in 1991, deaf and hard-of-hearing Americans making TTY/TDD-relayed text telephone calls were not receiving "telephone calls" at all. That cannot be squared with the ADA, and it cannot be squared with the 1991 dictionaries set out above. The Georgia decisions never address this critical backdrop.

### C.  The 2018 § 227(e) amendments were enacted in the *Chevron* world, and statutory *stare decisis* confirms that Congress's silence in § 227(c) was acceptance, not rejection, of the FCC's binding "text-equals-call" interpretation.

The centerpiece of the statutory argument adopted by the aforementioned courts is that Congress's later use of "text message" in § 227(e) shows Congress understood "telephone call" elsewhere in the TCPA to exclude texts. *See Kendo*, 2026 WL 810929, at *3; *1-800-Flowers*, 2026 WL 456919, at *3. The argument has surface textualist appeal. On close examination, however, it cuts decisively the other way. Two points compound to defeat it.

*First*, § 227(e)(8) defines its terms "[f]or purposes of this subsection." 47 U.S.C. § 227(e)(8). That subsection-specific definition does not purport to limit the use of the word "call" elsewhere in § 227, including § 227(c). *See Wilson v. Easy Spirit, LLC*, No. 3:25-CV-112 (SFR), 2026 WL 884170, at *7 (D. Conn. Mar. 31,

9

2026); *Rubin v. Staples, Inc.*, No. 2:25-15515 (WJM), 2026 WL 881651, at *6 (D.N.J. Mar. 31, 2026).

*Second*, and decisively, the 2018 amendments were enacted in a *Chevron* world. When Congress drafted § 227(e), the FCC's interpretation that the word "call" included text messages was not merely persuasive guidance, it was *binding* on the courts under *Chevron* and the provisions of the Hobbs Act.

See, e.g., *Mais v. Gulf Coast Collection Bureau, Inc.*, 768 F.3d 1110, 1121 (11th Cir. 2014) ("[T]he district court lacked the power to review the validity of the FCC's interpretation . . . ."); *Satterfield*, 569 F.3d at 952 (deferring to FCC under *Chevron* to hold texts are "calls"). Under a pre-*Loper Bright* regime, the FCC had already conclusively interpreted "call" in the TCPA to include text messages, and had done so as early as 2003. *See* 18 FCC Rcd. 14014, 14115-16 (2003).

Against that backdrop, Congress's drafting choices in 2018 send the *opposite* signal from the inference the authorities KDS cites draw. Congress did not need to add "text message" to § 227(c) to bring texts within § 227(c)(5) because the FCC *already had done so*, and under *Chevron*, courts were bound to follow that interpretation. If Congress had *disagreed* with the FCC's reading that the term "call" encompassed text message calls, the natural and obvious move

10

would have been to amend the statute to *reject* that binding interpretation.

Congress did the opposite. It amended an adjacent subsection while expressly

preserving FCC rules and orders. That is acceptance of the FCC's rulemaking. As

Judge Gettleman explained:

> Defendant correctly observes that Congress most recently amended the TCPA in 2018. The regulatory history and case law discussed above occurred prior to 2018. Thus, in 2018 it would have been known to Congress that the courts and the FCC were both consistently interpreting § 227(c) to include text messages.
> That Congress did not change anything about § 227(c) in the 2018 amendments can be read to represent exactly the opposite of what defendant advocates. In light of the regulatory history and case law that was known to Congress in 2018, Congress had the option to take affirmative action to exclude text messages from § 227(c)'s coverage. Congress did not do so. If Congress's inaction in 2018 is to be ascribed any meaning, the court interprets it as an acceptance of the existing case law and regulations that applied § 227(c) to text messages. This read on Congress's inaction is in harmony with the oft-repeated principle that statutory stare decisis is particularly strong, because Congress can change what the courts have concluded.

*Rabbitt v. Rohrman Midwest Motors, Inc.*, No. 25 C 11312, 2026 WL

851279, at *4 (N.D. Ill. Mar. 27, 2026).

The Supreme Court itself forecloses any contrary reading. *Loper*

*Bright* itself expressly declined to "call into question prior cases that relied

on the *Chevron* framework," explaining that the "holdings of those cases

that specific agency actions are lawful . . . are still subject to statutory *stare*

*decisis* despite [our] change in interpretive methodology." 603 U.S. at 376.

"Mere reliance on *Chevron* cannot constitute a special justification for

11

overruling such a holding." *Id.* (cleaned up). The Eleventh Circuit has already remarked on this limit. Although *Loper Bright* opens the door to new challenges based on new agency actions interpreting statutes, it forecloses new challenges based on specific agency actions that were already resolved through a *Chevron* deference analysis. *See Bastias v. U.S. Att'y Gen.*, 158 F.4th 1188, 1195 (11th Cir. 2025) (Newsom, J., concurring) (citing *Tennessee v. Becerra*, 131 F.4th 350 (6th Cir. 2025)). The Ninth and Second Circuits have agreed that *Loper Bright* provides no basis for disregarding prior circuit precedent that had rested on *Chevron*-era deference of a challenged regulation. *Lopez v. Garland*, 116 F.4th 1032, 1045 (9th Cir. 2024); *Garcia Pinach v. Bondi*, 147 F.4th 117, 121 (2d Cir. 2025).

Properly applied here, that doctrine is dispositive. When Congress enacted the 2018 amendments, the FCC's interpretation was a specific agency action upheld by multiple circuit courts of appeal under *Chevron* and was the law of the land. Statutory *stare decisis* preserves it. *Loper Bright*, 603 U.S. at 376. And the inference the aforementioned authorities incorrectly drew from Congress's silence in § 227(c) runs precisely *opposite* to historical reality. At the very least, it defeats KDS's inference that Congress's failure to amend § 227(c)(5) silently rejected the notion that it did not cover text message calls. In the *Chevron* era, congressional silence in

the face of a settled, binding agency interpretation was acceptance of that interpretation, not implicit disapproval. KDS would have this Court draw the *opposite* inference, an inference that *Loper Bright* itself forecloses.

> **D. The surplusage canon does no work for KDS because § 227(c)(5) reaches not "calls" in the abstract, but calls in v*iolation of the regulations*, which such regulations directly cover messages.**

The remaining argument running through *Kendo*, *1-800-Flowers*, and *Irvin* is that because § 227(a)(4) defines "telephone solicitation" as a "telephone call or message," the use of "telephone call" alone in § 227(c)(5) must *exclude* messages. The argument, too, has a literalist appeal, but it is easily dispatched.

Section 227(c)(5) does not establish a freestanding prohibition on "telephone calls." It creates a private right of action for receipt of "more than one telephone call . . . in violation of the *regulations prescribed under this subsection*." 47 U.S.C. § 227(c)(5) (emphasis added). The triggering predicate for liability is a *regulation* violation. The "regulations" under § 227(c), including § 227(c)(3)(F)'s directive to the FCC and 47 C.F.R. § 64.1200(c)(2), prohibit "telephone solicitations" to numbers on the Registry. And "telephone solicitation" is defined, with a belt-and-suspenders approach, to include "a telephone call *or message*." 47 U.S.C. § 227(a)(4). A text message solicitation thus *is* a "violation of the regulations prescribed under this subsection," and once a plaintiff has received more than one

13

such communication that violates the "regulations," § 227(c)(5) is triggered. Judge

Gettleman explained the structural fit:

> The implication of defendant's position is that when Congress created a private right of action tied to violations of the "regulations" promulgated under § 227(c)(1), it intended the private right of action to extend only to regulations concerning "telephone call[s]," which constitute a subset of the larger set of "telephone solicitations" that Congress mandated the FCC to regulate under § 227(c)(1). But defendant offers no explanation as to why this would be the case. Of course, as defendant correctly notes, text messaging did not exist as a technology in 1991. But this technological backdrop makes defendant's reading of the statute more confusing, because it implies a Congressional intent to distinguish "telephone call[s]" (voice calls only) from "telephone solicitations" (a category including texts) in 1991, when there was no difference between these concepts. Defendant has not provided a rationale explaining why Congress would make such a distinction or provided any legislative history supporting the proposition that Congress did make this distinction.

*Rabbitt*, 2026 WL 851279, at *3 (cleaned up). The structure of § 227(c)(5)

itself confirms the point from the opposite direction. The *same paragraph* that

creates the cause of action also supplies an *affirmative defense*: a defendant

escapes liability if it "has established and implemented, with due care, reasonable

practices and procedures to effectively prevent *telephone solicitations* in violation

of the regulations prescribed under this subsection." 47 U.S.C. § 227(c)(5)

(emphasis added). The safe harbor is thus keyed to the broad, defined category of

"telephone solicitation," which Congress expressly defined to include a "telephone

call *or message*," *id.* § 227(a)(4), not to voice calls alone. KDS's reading produces

a statute at war with itself, with the cause of action supposedly voice only, yet the

14

defense Congress paired with it is measured against the broader regulated category that indisputably includes both voice calls and "messages."

There is no coherent reason Congress would require a defendant to maintain procedures preventing unlawful "message" solicitations, while simultaneously restricting recovery only to "calls." The far more natural reading is that the liability provision and its defense reach the same conduct, telephone solicitations in violation of the regulations, whether transmitted by voice calls or by text message calls. KDS's reading severs the private remedy from the regulations it enforces, producing an underenforcement that Congress did not legislate. The surplusage canon is not a license to dismantle the regulatory scheme.

## II.  THE 1991 STATUTE, READ AS A WHOLE, COVERS TEXT MESSAGE SOLICITATIONS.
### A.  The same word in the same statute means the same thing.

It is a normal presumption of statutory construction that "identical words used in different parts of the same statute carry the same meaning." *Henson v. Santander Consumer USA Inc.*, 582 U.S. 79, 85 (2017) (cleaned up). The section before the provision at issue, § 227(b), uses the same operative word, "call", that the Supreme Court (albeit in *dicta*), the Seventh Circuit, the Ninth Circuit, and the Third Circuit have all read to include text messages. *Campbell-Ewald Co. v. Gomez*, 577 U.S. 153, 156 (2016) ("A text message to a cellular telephone, it is undisputed, qualifies as a "call" within the compass of § 227(b)."); *Howard*, 164

15

F.4th at 1123-24 (post-*Loper Bright* reaffirmation of *Satterfield* under independent statutory construction); *Satterfield*, 569 F.3d at 954; *Warciak v. Subway Rests., Inc.*, 949 F.3d 354, 356 (7th Cir. 2020); *Dominguez v. Yahoo, Inc.*, 894 F.3d 116, 117 n.3 (3d Cir. 2018).

Under *Henson*, the burden falls on KDS to explain why "call," the same word, in the same statute, a single section apart, includes a text message in § 227(b) but means something completely different and encompasses only voice calls in § 227(c)(5). KDS offers no answer. The authorities on which KDS relies wave them away as pre-*McLaughlin Chevron* cases on a different statutory subsection. *Howard* squarely refutes that reasoning. The *Howard* Court expressly held, post-*Loper Bright* and without any deference, that "it is clear from *Satterfield*'s substantive analysis that the conclusion would be the same even in the absence of *Chevron* deference." 164 F.4th at 1123.

### B.  Section 227(c)(1)(E) is an express delegation that survives *Loper Bright*.

Plaintiff prevails on text, structure, and history alone. But Congress also expressly delegated to the FCC the authority to fill up the details of the DNC regime. Section 227(c)(1)(E) directs the agency to develop the regulations that "the Commission determines are *most effective and efficient* to accomplish the *purposes of this section*." 47 U.S.C. § 227(c)(1)(E) (emphasis added). *Loper Bright* did not eliminate this kind of delegation. Where Congress empowers an agency to "fill up

16

the details of a statutory scheme," or tells an agency "to regulate subject to the limits imposed by a term or phrase that leaves agencies with flexibility," courts afford deference to those interpretations. *Loper Bright*, 603 U.S. at 394-95. In that case, a court's role is merely to "fix[] the boundaries" of agency authority and ensure "reasoned decisionmaking" within them. *Id.* at 395; s*ee Pickens v. Hamilton-Ryker IT Sols., LLC*, 133 F.4th 575, 587-88 (6th Cir. 2025).

Section 227(c) is the paradigm case. *See Wilson v. Skopos Fin., LLC*, 2025 WL 2029274, at *4 (D. Or. Jul. 21, 2025); *Mey v. Liberty Home Guard, LLC*, 2026 WL 486556, at *6-7 (N.D. W. Va. Jan. 5, 2026). At minimum, the FCC's longstanding, technical, and repeatedly affirmed interpretation that "call" includes texts is entitled to "great weight" for its "power to persuade." *Loper Bright*, 603 U.S. at 388 (citing *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

## III.  *SANDOVAL* IS INAPPOSITE; READING § 227(c)(5) TO COVER TEXT MESSAGES IS NOT THE CREATION OF AN UNAUTHORIZED CAUSE OF ACTION.

KDS invokes *Alexander v. Sandoval*, 532 U.S. 275 (2001), and *Love v. Delta Air Lines*, 310 F.3d 1347 (11th Cir. 2002), to argue that reading texts as calls would impermissibly "push the private right of action beyond the bounds of what Congress enacted." The argument inverts *Sandoval*.

*Sandoval* addressed whether courts should *infer* a private right of action where Congress did not create one. 532 U.S. at 286 ("[P]rivate rights of action to

17

enforce federal law must be created by Congress."). The Court declined to imply such a right under Title VI. *Id.* at 293. But Section 227(c) of the TCPA expressly authorizes the creation of regulations to protect consumers' privacy rights, like the Do Not Call regulations here, *Dobronski v. Selectquote Ins. Servs.*, 773 F. Supp. 3d 373, 376 (E.D. Mich. 2025), and Section 227(c)(5) expressly creates the remedy.

*Sandoval* restrains the judicial *creation* of remedies Congress did not enact. It says nothing about how to construe the scope of a private right of action that Congress *did* enact. The interpretive question here is the opposite of *Sandoval*'s: how broad is the cause of action Congress *expressly* created in § 227(c)(5)? Just as it is inappropriate to infer a cause of action where Congress has not provided one, KDS attempts to artificially limit a cause of action Congress has clearly chosen to provide. *Cannon v. Univ. of Chicago*, 441 U.S. 677, 689 n.9 (1979) (abrogated on other grounds). Reading "telephone call" at its 1991 meaning is not the creation of a new remedy. Rather, it is faithful application of the one Congress enacted.

In this respect, KDS gets the analysis backwards. Although courts cannot rewrite a statute to update it to account for modern technology, *Facebook, Inc. v. Duguid*, 592 U.S. 395, 397 (2021), Congress can nevertheless craft an open-ended statutory mandate that *accommodates* developments "in light of advances in technology," *FCC v. Consumers' Rsch.*, 145 S. Ct. 2482, 2505 (2025). That's precisely what Congress did when it directed the FCC to "initiate a rulemaking

proceeding" concerning consumer privacy. 47 U.S.C. § 227(c)(1). Misreading *Alexander*, KDS advocates a reading that rewrites the statute to *shrink* the TCPA's privacy protections because technology has changed. There are limits to the "power of technology to shrink the realm of guaranteed privacy." *Kyllo v. United States*, 533 U.S. 27, 34 (2001). A court looks to the plain meaning of the text, rather than the specific facts or technology that Congress may have had in mind in 1991 at the time of the TCPA's passage, which nevertheless included various forms of text-based communications as "calls," as outlined above. *Wilson v. MEDVIDI Inc.*, 2025 WL 2856295, at *2 (N.D. Cal. Oct. 7, 2025).

The Supreme Court's recent decision in *Bostock v. Clayton County*, 590 U.S. 644 (2020), all but precludes the analysis conducted by KDS. *Bostock* makes clear that the plain text of a statute controls, even if the Congress that passed the law *never intended* the law to be used so broadly. *Id.* at 652. "When the express terms of a statute give us one answer and extratextual considerations suggest another, it's no contest. Only the written word is the law, and all persons are entitled to its benefit." *Id.* at 652-53. It's irrelevant that Congress didn't have modern text messaging specifically in mind in 1991 when it extended protection to "calls." *See supra* (citing *Consumers' Rsch.*, 145 S. Ct. at 2505). What matters is that Congress clearly understood "calls" not to be limited to voice communication, even in 1991.

19

Courts look to the meaning of the words Congress used, not the "particular manifestation of a problem" that would have been front of mind. *Id.*

KDS's reading also produces an absurd consequence the Court should avoid. If § 227(c)(5) excludes text messages, telemarketers may circumvent the DNC Registry simply by switching from voice to text, nullifying the Registry's central operative purpose. 47 U.S.C. § 227(c)(1). "It strains belief to suggest that Congress silently determined that oral messages were more invasive or objectionable than written ones." *MEDVIDI*, 2025 WL 2856295, at *3. Courts avoid readings that nullify a statute's central operative provision. *See King v. Burwell*, 576 U.S. 473, 497-98 (2015).

## IV.  THE COURT SHOULD DISREGARD THE COLLATERAL MATERIAL IN THE GRAVES AFFIDAVIT AND DENY KDS'S PROCEDURALLY IMPROPER CLASS REQUEST.

KDS itself tells the Court that consent is "immaterial" and that the only material facts are that KDS sent texts and Plaintiff received them. Its entire Motion is dedicated to the aforementioned issue of whether a text message is a "call" under the TCPA. The Court should hold KDS to that framing. If texts are calls, the Motion fails on the merits and the matter proceeds to a jury trial to adjudicate disputed consent issues. If they are not, the consent issues never matter. Either way, no collateral finding is necessary or appropriate.

20

That is important because the Graves Affidavit sweeps in a panoply of not only disputed and inadmissible material but also legal conclusions that have no place on this Motion. For example, the Graves Affidavit makes numerous legal conclusions as to the law of consent and whether text message calls are "calls" within the meaning of the TCPA. These are all legal arguments, made by a lay witness, and are in any event improper for inclusion or consideration on a Rule 56 motion because it is argument, lacks foundation, is unsupported by admissible evidence, and fails to show personal knowledge. *See Leigh*, 212 F.3d at 1217.

Other parts of the Graves Affidavit are similarly disputed and, most importantly, simply irrelevant to this Court's consideration of the singular *legal* issue on which Key Digital has moved for summary judgment. For example, Graves's account of purported "consent" is sharply disputed, unsupported by any admissible evidence, and contradicted by the Plaintiff's own affidavit. More fundamentally, KDS does not move for summary judgment on the basis of putative consent. Relatedly, Graves's "ratification" theory that somehow clicking on a link in an illegal call is a substitute for consent, fails on timing, since any clicks occurred *after* the illegal calls, so they cannot supply *prior* express invitation or permission for calls already made. And other of Graves's assertions and speculation, much of which he lacks personal knowledge of, is not Rule 23 evidence. The Court should disregard all of it. To the extent KDS seeks any

21

collateral factual determination, the Court should decline to enter any Rule 56(g) finding because those matters are unnecessary to the narrow legal issue on which KDS moved and are either disputed or unsupported.

KDS's tagalong request that the Court "order that no class can be certified" is procedurally improper. Rule 56 is not the vehicle for adjudicating Rule 23. If KDS feels that class certification is improper here, it is free to file a motion under Rule 23 to deny class certification. A merits motion turning on the meaning of a "call" does not address, and KDS does not brief, any of the Rule 23 elements. *Rensel v. Centra Tech, Inc.*, permits a court to *deny* an untimely Rule 23 motion for class certification. 2 F.4th 1359, 1364 (11th Cir. 2021). But no part of that opinion permits a Court to render a class certification decision governed by Rule 23 in a Rule 56 motion for summary judgment. If KDS wants Rule 23 relief, the proper course is a properly noticed Rule 23 motion.

## CONCLUSION

The 1991 ordinary meaning of "telephone call" as including text-based communication, including under the 1990 ADA backdrop, statutory *stare decisis* applied to Congress's 2018 silence in the *Chevron* era, the structural fit between § 227(c)(5) and the DNC regulations it enforces, *Henson*'s consistent usage canon, the express delegation in § 227(c)(1)(E), the only post-*McLaughlin* circuit decision in *Howard*, and the wealth of authority from other courts all across the country all

point the same way. The Northern District of Georgia and other decisions on which

KDS relies are not binding on this Court and, with respect, were wrongly decided.

The Motion should be denied. The Court should disregard the Graves Affidavit as

irrelevant to deciding the narrow legal issue before it here at summary judgment

and deny KDS's procedurally improper class request.

Date: May 21, 2026.

> */s/ Anthony I. Paronich*
> Anthony I. Paronich, *Pro Hac Vice*
> Paronich Law, P.C.
> 350 Lincoln Street, Suite 2400
> Hingham, MA 02043
> anthony@paronichlaw.com
>
> Attorney for Plaintiff

### CERTIFICATE OF COUNSEL

I hereby certify that the foregoing was prepared, in accordance with L.R.

5.1(C), by a computer process on one side of the page only, was double spaced

between lines, and was not materially defaced by erasures or interlineations. I further

certify that the foregoing was prepared in Times New Roman, 14-point font.

Date: May 21, 2026

> */s/ Anthony I. Paronich*
> Anthony I. Paronich

**CERTIFICATE OF SERVICE**

I hereby certify that I have electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will automatically send a copy to all counsel of record.

Date: May 21, 2026

/s/ Anthony I. Paronich
Anthony I. Paronich